# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDRE DAVIS, | 1:03-CV-6484 LJO HC |
|     Petitioner, | |
| v. | ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS |
| CHARLES T. RANSDELL, Warden, | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT |
|     Respondent. | |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The parties have voluntarily consented to the exercise of Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1).

**INTRODUCTION**

On April 13, 2006, an evidentiary hearing on the petition for writ of habeas corpus was conducted in Department 8 of the United States District Court. The hearing lasted a full day with the following witnesses having testified:

1. Andre Davis, Petitioner;
2. Gabriel Ayala, correctional officer for the CDC
3. Sandra Ayala, wife of Gabriel Ayala
4. Steven Garringer, expert for Petitioner;
5. Garrick Byers, expert for Petitioner; and
6. Dennis Doherty, state court defense trial counsel.

After closing arguments, the matter was taken under submission for written ruling.

# PARTIES AND REPRESENTATION

Petitioner, Andre Davis, is represented in this action by Michael J. Fitzpatrick, Esquire. Respondent, Charles T. Ransdell, Warden, is represented in this action by Deputy Attorneys General Julie A. Hokans, Esquire, and Maggy Krell, Esquire.

# PROCEDURAL HISTORY[1]

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Madera, following his conviction by jury trial on June 2, 2000, on the following counts: Count One, attempted forcible oral copulation (Cal. Penal Code §§ 664/288a, subd. (c)(2)); Count Two, attempted sexual battery (Cal. Penal Code §§ 664/243.4); and Count Three, assault (Cal. Penal Code § 240).  See Exhibit H, Answer to Petition for Writ of Habeas Corpus (hereinafter "Answer"). Counts One and Two were allegations wherein the alleged victim was Correctional Officer W.   Count Three involved allegations against a separate victim. Only Counts One and Two are the subjects of the instant petition. On October 20, 2000, Petitioner was sentenced to a total determinate term of seven years in state prison. Id.

Thereafter, Petitioner filed a notice of appeal with the California Court of Appeal, Fifth Appellate District (hereinafter "5th DCA"). During the pendency of the appeal, Petitioner also filed a petition for writ of habeas corpus in the 5th DCA. See Exhibit B, Answer.  On January 17, 2002, the 5th DCA denied the petition for writ of habeas corpus without prejudice to refiling it in the Superior Court.  On July 15, 2002, the 5th DCA issued an unpublished opinion affirming the judgment. See Exhibit H to the Answer.

Petitioner did not file a petition for review in the California Supreme Court.

On April 29, 2002, Petitioner filed a petition for writ of habeas corpus in the Madera County Superior Court. See Exhibit J, Answer.   On August 1, 2002, the petition was denied on the merits. See Exhibit K, Answer. Petitioner filed a second petition for writ of habeas corpus in the Madera County Superior Court on October 17, 2002. See Exhibit L, Answer. That petition was rejected on November 4, 2002, on procedural grounds. See Exhibit M, Answer. On October 17, 2002, Petitioner

---

[1] This information is derived from the petition for writ of habeas corpus, Respondent's answer to the petition, and Petitioner's traverse to Respondent's answer.

1  filed a second petition for writ of habeas corpus in the 5th DCA. See Exhibit N, Answer. The 5th

2  DCA summarily denied the petition on November 1, 2002. See Exhibit O, Answer. On December 6,

3  2002, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. See

4  Exhibit P, Answer. On September 10, 2003, the petition was summarily denied. See Exhibit Q,

5  Answer.

6  On October 24, 2003, Petitioner filed a federal habeas petition in this Court. The petition

7  raises the following ground for relief: Petitioner claims he received ineffective assistance of counsel

8  when trial counsel failed to call a witness for the defense. This claim, as discussed on the record at

9  the time of the Evidentiary Hearing, included a failure to investigate the need to call witness Gabriel

10  Ayala.

11  On May 3, 2004, Respondent filed an answer to the petition.

12  On June 1, 2004, Petitioner filed a traverse.

## FACTUAL BACKGROUND[2]

14  On January 18, 1999, Correctional Officer W. was assigned as the floor officer to Building

15  508, which is a housing unit for inmates at the Central California Women's Facility (CCWF).

16  Officer W. was working the first shift, from 10:30 p.m. to 6:30 a.m. No other officers were assigned

17  to the building that shift. Petitioner was working that night as the outside patrol sergeant. Officer W.

18  first saw Petitioner that night when she was in the officers' station. Petitioner knocked on the door to

19  the building and wanted her to let him in, which she did.

20  Officer W. and Petitioner then walked back to the officers' station. Petitioner was standing

21  and leaning on one side of the counter area, and Officer W. was standing and leaning on the other

22  side. After a brief conversation, Petitioner unzipped his pants, exposed his penis, and said, "You're

23  going to take care of this." Officer W. was in total shock and disbelief. She told Petitioner that he

24  was "crazy" and could lose his job for his conduct. Petitioner replied, "Nobody is going to believe

25  you."

26  Petitioner took Officer W. by her shoulder and shoved her in a chair with his left hand while

---

[2] These facts are taken from the factual summary set forth in the 5th DCA's opinion of July 15, 2002. See Exhibit H, Answer.

masturbating his penis with his right hand. Petitioner then thrust his pelvis toward her face, still holding his penis with his hand, while Officer W. turned her head from side to side. Petitioner's penis was right in front of Officer W.'s face, so that each time she turned her head she felt his penis on her face. She tried to get up but Petitioner held her down. Officer W. was "totally terrified." Petitioner continued his actions for a couple of minutes. Petitioner eventually stopped and zipped up his pants. Officer W. walked out the door of the officers' station, and Petitioner followed her. Petitioner stood by the door to the day room, which is directly behind the officers' station, and told her to come over to him because he wanted to talk to her. Officer W. told Petitioner to leave, which he eventually did.

On February 15, 1999, Officer W. was working the perimeter of the prison outside the electric fence during the first watch, from 10:30 p.m. to 6:30 a.m. That night, Petitioner was the outside patrol sergeant and Officer W.'s direct supervisor. He was also working the perimeter. Other than Officer W. and Petitioner, no one else was working outside the perimeter fence. Around 12:30 a.m., Petitioner radioed Officer W. and told her to meet him at an outside perimeter station, which is not usually manned. When Officer W. drove up, Petitioner was standing outside the station. Petitioner pulled her truck up next to him and asked Petitioner what he needed. Petitioner told her to get out of the truck. Concerned that Petitioner would again assault her, Officer W. told him she would not get out of the truck. Petitioner replied, "I told you to get out of the truck and get inside."

Officer W. followed Petitioner's orders; she went into the building and sat on a chair. After closing the door, Petitioner removed his erect penis from his pants and walked towards her. When Officer W. said "no," Petitioner grabbed the back of her head with his left hand, with her hair in his fist, and held her down in the chair. With his right hand, Petitioner forced his penis into her mouth. Petitioner then placed his right hand behind her head and moved her head back and forth while his penis was in her mouth. After about a minute, he ejaculated in her mouth. Petitioner was still holding onto the back of Officer W.'s head with both of his hands. Officer W. was not able to move during the incident. Officer W. did not scream because she was scared; moreover, no one would have heard her if she did. Petitioner turned around and started to walk out the door. Petitioner told her if she reported the incident, no one would believe her, and then said, "Don't you have a job to do?" After

that, Petitioner left.

Officer W. did not initially report either incident because she was afraid of Petitioner. A few months prior to the sexual assaults, Petitioner had followed her home from work. Petitioner stopped in front of her home and told her he was coming in. When Officer W. said her boyfriend was home, Petitioner drove off. Officer W. also felt if she came forward and reported the incidents, it would be her word against his, and nobody would believe her since he had been there longer and she was a new probationary, part-time employee. Officer W. was also afraid of losing her job.

Officer W. did not say anything about the incidents for five months until July 29, 1999, when Officers Stoetzl and Gault, who are union representatives, called her over during a recess for a training class and asked her if she had experienced any incidents or run-ins with Petitioner. Officer W. asked the other officers if the conversation would be confidential; they assured her it would be. Officer W. indicated to them that she had experienced some problems with Petitioner. Officer Gault recalled Officer W. telling them she had been sexually assaulted while on duty, other females were involved, and she was concerned about her job. Officer Gault asked Officer W. to contact the other women before giving them their names. When Officer W. returned home from the training that morning, there was a phone message from Officer Gault, who said because of what she said, the matter would need to be turned over to the Investigative Services Unit at the prison. Officer W. was interviewed the following morning.

At trial, Petitioner neither took the stand, nor did Petitioner call any witnesses.

## DISCUSSION

### I. Issue

The evidentiary hearing was necessary to resolve the sole ground for relief presented in the petition, to wit: Petitioner claims he received ineffective assistance of counsel both in the investigation phase and at the trial phase of the Madera Superior Court action against him. Those claims center around a specific witness, and only one witness, Gabriel Ayala.

### II. Legal Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

1  Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

2  The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA) which became effective on April 24, 1996. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); <u>see</u> <u>Lockyer</u>, 538 U.S. at 70-71; <u>see</u> <u>Williams</u>, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Lockyer</u>, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." <u>Id.</u>, *quoting* <u>Williams</u>, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id</u>.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." <u>Lockyer</u>, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id</u>. at 411. A

federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

In an evidentiary hearing, the Federal Rules of Evidence are applied.

**III. Legal Standard: Ineffective Assistance of Counsel**

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.) In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

1    Second, the petitioner must demonstrate that "there is a reasonable probability that, but for
2 counsel's unprofessional errors, the result ... would have been different," 466 U.S., at 694. Petitioner
3 must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose
4 result is reliable. Strickland, 466 U.S. at 688.  The court must evaluate whether the entire trial was
5 fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78
6 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

7    A court need not determine whether counsel's performance was deficient before examining
8 the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S.
9 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since the defendant must affirmatively prove prejudice, any
10 deficiency that does not result in prejudice must necessarily fail.  Ineffective assistance of counsel
11 claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362
12 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2002).

13    In presenting a claim of ineffective assistance based on counsel's failure to call witnesses,
14 Petitioner (1) must identify the witness, U.S. v. Murray, 751 F.2d 1528, 1535 (9th Cir. 1985), (2)
15 show that the witness was willing to testify, U.S. v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988),
16 and (3) show that the witness's testimony would have been sufficient to create a reasonable doubt as
17 to guilt.  Tinsley v. Borg, 895 F.2d 520, 532 (9th Cir. 1990); see also United States v. Berry, 814
18 F.2d 1406, 1409 (9th Cir. 1989) (holding that where defendant did not indicate what witness would
19 have testified to and how such testimony would have changed the outcome of the trial, there can be
20 no ineffective assistance of counsel).

21 **IV. Law Allowing an Evidentiary Hearing**

22    A habeas petitioner is entitled to an evidentiary hearing as a matter of right on a claim where
   the facts are disputed if two conditions are met: (1) the petitioner's allegations would, if
23   proved, entitle him to relief; and (2) the state court trier of fact has not, after a full and fair
   hearing, reliably found the relevant facts.
24
25 Jones v. Wood, 114 F.3d 1002, 1010 (9th Cir.1997), citing Hendricks v. Vasquez, 974 F.2d 1099,
26 1103 (9th Cir.1992). The first prong commonly is referred to as the requirement of asserting a
27 "colorable claim." Siripongs v. Calderon, 35 F.3d 1308, 1310 (9th Cir.1994). The familiar six factors
28 identified in Townsend v. Sain, 372 U.S. 293, 313 (1963), inform the judicial evaluation of the

second prong of this test.

The Ninth Circuit, in the case of <u>Earp v. Ornoski</u>, 431 F.3d 1158 (9th Cir.2005), refers to the "colorable claim" standard as a "low bar." <u>Id</u>. at 1170. Based on this language, courts may draw the conclusion that evidentiary hearings should be granted on a more liberal basis. The "low bar" standard, however, does not liberalize the granting of an evidentiary hearing based on the <u>persuasiveness</u> of the evidence. Rather, the "low bar" standard, in the context of the opinion, refers to the <u>form</u> of the evidence. The Ninth Circuit further found that in circumstances where declarations are submitted as offers of proof for an evidentiary hearing, the veracity of the declarants cannot be determined without conducting a hearing where credibility and demeanor can be assessed by the judge. Based on the specific allegations found in the petition and in compliance with the holding of the Ninth Circuit in the <u>Earp</u> case, this Court set an evidentiary hearing.

## V. Petitioner's Argument

Gabriel Ayala was willing to testify on behalf of the petitioner. He had been subpoenaed to trial by criminal defense counsel Dennis Doherty, and appeared, only to be told by Mr. Doherty (or at his direction) that his testimony would not be needed. Petitioner argues that defense counsel's failure to investigate Mr. Ayala's potential testimony, coupled with his failure to put Mr. Ayala on the stand at trial constitutes ineffective assistance of counsel. Further, Mr. Ayala's testimony would have at least contradicted and possibly negated the alleged victim's trial testimony about being in fear of the petitioner, thus casting doubt on the alleged victim's credibility on whether the two attacks occurred. In sum, that effective assistance of counsel would have altered the outcome of the trial.

## VI. Respondent's Argument

Criminal defense counsel Dennis Doherty, with 25 years of experience as a criminal defense lawyer, made a conscious decision not to call Gabriel Ayala as a trial witness for good reasons. This decision was well within the sound trial strategy afforded to him, and that his decision was not unreasonable and should be given great deference. Furthermore, to suggest that there would have been a different result is speculation. Finally, Respondent argues that the petitioner has not overcome the strong presumption afforded the state court decision by the AEDPA.

**VII. Evidentiary Hearing of April 13, 2006: Credibility, Commentary and Finding**

The credibility of witnesses is crucial and is determined by an array of factors, including but not limited to demeanor, prior inconsistent statements, prior consistent statements, an admission of inaccuracy, and a motive either to be truthful or untruthful. The Evidentiary Hearing and declarations referred to therein included all of these listed factors, and this decision turns on the credibility issues.

Petitioner Andre Davis came across as an admittedly angry witness. He also came across as a witness who knew which attorney was asking the questions, meaning that he had a more specific recollection when his own attorney interrogated him. For instance, his testimony about his recollection of the number of times he told Attorney Doherty about Mr. Ayala was not credible. Furthermore, his testimony that criminal defense lawyer Doherty told him that "they have nothing" on him or that there was "nothing to worry about" is not believable.

Trial attorney Dennis Doherty conveyed three possibilities surrounding his testimony: (1) A faulty memory; (2) A convenient memory; or (3) A penchant for being untruthful when convenient. It is not crucial to the determination of the instant petition for this Court to decide which of these options was in play. Based on the combination of Mr. Doherty's 2001 declaration, his declaration of April 10, 2006 (3 days before the evidentiary hearing), and the testimony at the evidentiary hearing, the Court cannot rely on the truth and/or accuracy of his testimony. Examples:

1. Paragraph 15 of the April 10, 2006, declaration (Ex. 2 to the hearing) is in direct contradiction to his clear and detailed testimony three days later concerning whether Ayala was even supposed to appear at trial.

2. Paragraph 9 of the April 10, 2006, declaration is contrary to his newly-found memory at the evidentiary hearing on the topic of the alleged telephone conversation with Mr. Ayala.

3. Paragraph 5 of the April 10, 2001, declaration (Ex. C to the Answer to the Petition for Writ of Habeas Corpus), while using the name of another witness, uses the same reason and phraseology used by Mr. Doherty at the evidentiary hearing to explain why he didn't call Mr. Ayala as a witness at the trial.

4. Having just given reasons in that declaration lines before to explain why he didn't call a different witness, it can not be argued that he had forgotten those same reasons for not calling

Gabriel Ayala. In paragraph 6 of the April 10, 2001, declaration, Mr. Doherty claims that the reason he did not call Mr. Ayala at trial was because he didn't think the testimony was "critical." At the evidentiary hearing, he said that the main reason not to call Ayala was that he didn't think the evidence was credible. The positions are totally different and entirely unexplainable.

Under the best case scenario to explain Mr. Doherty's testimony, he simply confused the telephone conversation he apparently had with potential witness Karen Mentzell with the conversation he did not have with potential witness Gabriel Ayala.

Finally, it is not credible that Mr. Ayala would be unwilling to help in the case of his friend, coworker and baseball teammate at trial, but after an absence of any contact whatsoever for 6 years, Mr. Ayala would now be willing to step forward to meet with experts for the petitioner, submit declarations, and testify at an evidentiary hearing to help Mr. Davis.

The testimony and declarations of Gabriel Ayala were consistent and credible. The discrepancy about prior "contact" with counsel Doherty did not appear to be a topic of confusion as it related to the existence of an "interview" with that same counsel. On that crucial (and not collateral) issue, Mr. Ayala was clear. He was equally clear about the critical, claimed meeting among the three (Davis, Ayala, and Officer W.). His testimony is consistent with the probability that the meeting occurred on either May 8 or May 19 (comparing Ex. 5 possibilities).

When Mr. Ayala testified that he did not recall the substance of the conversation between Officer W. and Petitioner Davis, it had the ring of credibility to it because based on all evidence before this Court, the conversation was casual and not at all substantive. The importance of the meeting was two-fold:

1. That Officer W. approached the petitioner, and not the other way around; and

2. Officer W.'s demeanor was friendly, forward, touching and light, tending to show (if believed) that neither fear nor apprehension existed. In other words, that Officer W's trial testimony was inconsistent with her fear of, and attempt at avoiding the Petitioner.

This Court finds that no interview of any kind, telephonic or personal, ever took place between the potential witness Correctional Officer Gabriel Ayala and Attorney Dennis Doherty.

Since the prosecutorial emphasis at the time of the criminal trial was that the alleged victim of Counts One and Two, Officer W, was fearful and intimidated, Officer Ayala's testimony would have gone to the very heart of the criminal case.

For the criminal defense attorney to: 1) use Petitioner Davis as his exclusive source for what crucial witness Ayala would say at trial; and 2) conclude that because he felt his own client, Petitioner Davis, was a liar, that a witness suggested by Mr. Davis must also be one, gives rise to the conclusions this Court expresses below.

**CONCLUSIONS AND ORDER**

Trial counsel Dennis Doherty's performance was deficient and made an error so serious that he was not functioning as the counsel guaranteed to Mr. Davis by the Sixth Amendment of the U. S. Constitution. That conduct fell below an objective standard of reasonableness when Mr. Doherty failed to meet with a witness who had the potential to contradict and thereby impeach an alleged victim on a crucial and material issue that was central to the prosecutor's case, i.e. fear and intimidation allegedly experienced by Officer W.

The Court further finds that there is a reasonable probability that, but for the counsel's errors, the result would have been different. This is especially true since, there was a significant delay in reporting the crime (i.e. numerous months), there was no physical evidence available at trial, and the crucial issue for a trier of fact to determine was credibility.

The Petition for Writ of Habeas Corpus is GRANTED and the Clerk of Court is DIRECTED to enter judgment for Petitioner. Respondent is ORDERED to either retry Petitioner within 60 days or notify the Court that there will not be a retrial. IF the decision is the latter, Petitioner is ORDERED released from custody.

IT IS SO ORDERED.

**Dated:   April 19, 2006**               /s/ Lawrence J. O'Neill
b9ed48                                    UNITED STATES MAGISTRATE JUDGE